**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| NIKE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:25-cv-01596-MTS |
| ) | |
| THE PARTNERSHIPS AND ) | |
| UNINCORPORATED ASSOCIATIONS ) | |
| IDENTIFIED ON SCHEDULE A, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

This matter is before the Court on several Motions filed by Plaintiff Nike, Inc. ("Nike"): an *Ex Parte* Motion for Entry of a Temporary Restraining Order ("TRO"), including a Temporary Injunction, a Temporary Asset Restraint, and Expedited Discovery, Doc [12]; a Motion for Electronic Service and Service by Publication, Doc. [21]; a Motion for Bond of $10,000, Doc. [19]; and two Motions for Leave to File Court Documents under Seal, Docs. [5] and [16]. For the reasons that follow, the Court will grant each Motion and enter a separate Order to that effect.

**I.   Background**

Nike's trademarks are world famous. Indeed, Nike boasts "a multi-billion-dollar brand" that is the result of considerable effort "designing, developing, and advertising its products." Doc. [15] ¶ 4. Unsurprisingly, such success draws the attention of counterfeiters who seek to sell unauthorized, trademark-infringing versions of Nike's products. *Id.* ¶ 15. Against this backdrop, Nike has filed suit against ninety-one individuals and business entities (the "Defendants"), each of whom allegedly resides in the People's Republic of China or other foreign jurisdictions and operates an e-commerce store that advertises and sells products violating the following trademarks:

| Registration Number | Trademark |
|---|---|
| 977,190 | (Swoosh design) |
| 1,214,930 | **NIKE** |
| 1,237,469 | (NIKE with swoosh design) |
| 1,238,853 | (NIKE with swoosh design) |
| 1,264,529 | (Swoosh design) |
| 1,277,066 | **NIKE** |
| 1,284,385 | (Swoosh design) |
| 1,323,343 | (Swoosh design) |
| 1,370,283 | AIR JORDAN |
| 4,908,872 | VOMERO |
| 5,794,674 | (Swoosh design) |
| 6,639,128 | (Air Jordan 4 shoe design) |

| Registration Number | Trademark |
|---|---|
| 6,682,467 | (shoe design) |
| 6,695,024 | air (stylized) |
| 6,865,381 | AIR ZOOM |

Doc. [1] at 4–5; Doc. [1-1].  In support of its Motion for Temporary Restraining Order, Nike attaches webpage screenshots showing, for each of the Defendants respective e-commerce sites, infringing products listed for sale.  *See, e.g.*, Docs. [17-2], [17-6].  Commonalities between the Defendants' e-commerce stores—common design elements, the same incorrect grammar and misspellings, and use of the same text and images—indicate that the Defendants are interrelated and that their counterfeit products come from a common source.  Doc. [15] ¶ 22.

Moreover, Joe Pallett, Nike's Global Director of Brand Protection, has provided sworn testimony describing Defendants' conduct in this matter:

> Defendants have targeted sales to Missouri residents by setting up and operating e-commerce stores that target U.S. consumers using one or more Seller Aliases; by offering to ship or shipping products to the United States, including Missouri; by accepting payment in U.S. dollars and/or funds from U.S. bank accounts; and by selling counterfeit versions of Nike products that infringe Nike's federally registered trademarks to residents of Missouri.

Doc. [15] ¶ 17.  In addition, Defendants have employed deceptive practices to mislead their customers when purchasing these items, namely by adopting marketing and advertising strategies similar to those used by Nike, such that Defendants' e-commerce stores appear to be authorized

retailers of Nike's products. *Id.* ¶ 18.  Mr. Parratt explains that Nike is significantly harmed by Defendants' conduct in several ways.  First, Defendants have caused Nike to lose control over its own reputation because it has lost the ability to control the nature and quality of counterfeit products that the Defendants sell. *Id.* ¶ 28.  As prospective customers mistakenly purchase or encounter unauthorized merchandise, those customers "may believe that Nike offers low-quality products," and they may "become skeptical of or hesitate to purchase genuine Nike products." *Id.* ¶ 29.  And, of course, Defendants' conduct deprives Nike of the exclusive use of its trademarks and of sales to prospective purchasers. *Id.* ¶ 30.

In its Complaint, Nike asserts two counts against each of the ninety-one Defendants, one for Trademark Infringement and Counterfeiting, *see* U.S.C. § 1114, and another for False Designation of Origin, *see* 15 U.S.C. § 1125(a).  Doc. [1] at 12–13.  Nike seeks temporary, preliminary, and permanent injunctive relief in two primary respects: (1) an order enjoining Defendants' unauthorized and unlawful use of Nike trademarks, and (2) an order restraining Defendants' assets "so that Nike's right to an equitable accounting of Defendants' profits" from counterfeit products "will not be impaired."  Doc. [13] at 12–13.  Nike seeks monetary damages as well, either in the form of treble damages or statutory damages.  Doc. [1] at 15.  To begin the process of obtaining this relief, Nike asks the Court to issue a TRO without notice because, if notice is given, "Defendants can and likely will register new e-commerce stores under new seller aliases and move any assets to offshore bank accounts outside the [Court's] jurisdiction."  Doc. [13] at 6; Doc. [14] ¶¶ 5–11.  Nike also seeks to issue expedited discovery to ascertain "bank and payment system accounts [that] Defendants use for their counterfeit sales operations." *Id.* at 13.  Nike contends that "[d]iscovery of these financial accounts so that they can be frozen is necessary to ensure that these activities will be contained." *Id.*

Further, Nike asks for the Court's leave to serve these ninety-one Defendants via alternative methods pursuant to Federal Rule of Civil Procedure 4(f)(3), specifically by:

> electronically publishing a link to the Complaint, the Temporary Restraining Order, and other relevant documents on a website, (ii) by sending an e-mail with a link to said website to an e-mail address for each Defendant, and/or (iii) by sending an e-mail to any e-mail addresses third parties provide for Defendants, which will include a link to said website.

Doc. [22] at 1.  According to Nike, service by publication and by email is appropriate in this case because e-commerce sellers like Defendants often "provide false, misleading and/or incomplete names and physical address information to conceal their locations and to avoid liability," and they "rely heavily on electronic communications to communicate with their third-party service providers and customers."  *Id.* at 2.  Nike contends that its proposed service method will ensure "Defendants receive prompt notice of this action and will allow this action to move forward expeditiously."  *Id.*  Finally, Nike asks for several court documents to remain under seal, at least during the initial stages of this litigation.  Docs. [5] and [16].  The Court addresses each Motion below.

**II.     Discussion**

In the Eighth Circuit, the standard for issuing a temporary injunction is identical to the standard for issuing a preliminary injunction.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).  Courts consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other [litigants]; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  The key question is "whether the balance of equities so favors the

movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

Whether a temporary restraining order should issue *ex parte*, however, requires additional analysis. Under the Federal Rules of Civil Procedure:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

On the record before it, the Court concludes that the injunctive relief Nike seeks is warranted here. First, a review of the exhibits filed in this matter shows that Nike will likely succeed on the merits. Nike has provided sworn testimony explaining that Defendants have targeted Missouri residents with their illicit activities and have sold counterfeit, trademark-infringing products in the state. Doc. [15] ¶ 17; *see NBA Props. Inc. v. HANWJH*, 46 F.4th 614, 627 (7th Cir. 2022) (finding personal jurisdiction over defendant that "availed itself of the [relevant] market in offering and shipping a product to the forum"). Moreover, Nike has demonstrated that "it has a valid, protectable mark" with respect to each of the above trademarks. *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023); *see* Doc. [15] ¶¶ 5–6; Doc. [1-1]. And a review of the webpage screenshots associated with each of the ninety-one Defendants' e-commerce stores shows that "there is a likelihood of confusion between [Nike's] mark and the marks that [the Defendants are] using." *H&R Block, Inc.*, 58 F.4th at 946; *see, e.g.*, Docs. [17-1], [17-2]. Second, this type of illicit conduct is routinely held to inflict irreparable harm to trademark-owning plaintiffs like Nike, especially where, as here, the plaintiff has shown that consumers will likely be confused by a defendant's infringement, *see Coca-Cola Co. v. Purdy*, 382 F.3d 774, 789

(8th Cir. 2004), and there is "a loss of intangible assets like reputation and goodwill," *see United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).

Third, the balance of the equities favors Nike as the trademark owner. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l, Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587–88 (D.D.C. 1994). The Court discerns no reason why the equities balance differently here because the harm that Defendants will likely suffer as a result of the injunctive relief imposed here is "self-inflicted." *Powerlift Door Consultants, Inc. v. Shepard*, 0:21-cv-1316-WMW-ECW, 2021 WL 2911177, at *7 (D. Minn. July 12, 2021) (entering a preliminary injunction); *accord Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 846 (D. Minn. 2011) (balancing the equities in favor of trademark owner in part because defendants "brought this harm upon themselves through their non-payment and infringement"). In addition, the Court finds that the scope of injunctive relief, including an asset freeze, is appropriate given the lengths that similar litigants take to remove their assets from the relevant jurisdiction and evade financial penalties. Doc. [14] ¶¶ 6–11. Finally, the injunctive relief Nike seeks is in the public interest. As an initial matter, "protecting property rights, including plaintiff's trademark, is obviously in the public interest." *Xiem Studio, LLC v. Nguyen*, 4:14-cv-1366-CEJ, 2015 WL 3795852, at *3 (E.D. Mo. June 18, 2015). In addition, "avoiding consumer confusion" is in the public's interest, *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 776 (8th Cir. 1994), as is "ensuring that defendants do not fraudulently or otherwise transfer assets during litigation to circumvent recovery by a wronged plaintiff," *MeccaTech, Inc. v. Kiser*, 8:05-cv-570-LSC, 2008 WL 934366, at *4 (D. Neb. Apr. 1, 2008). Accordingly, each of the *Dataphase* factors weighs in favor of issuing the TRO that Nike seeks here.

Further, the Court concludes that issuing the TRO without notice is appropriate in this instance.  Not only are the precise identities of the Defendants unclear because of the limited and often incorrect identifying information associated with e-commerce store operators, Doc. [15] ¶ 20; *see Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984) (recognizing that ex parte TROs may be appropriate where "the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing"), but litigants engaged in similar conduct frequently take steps to avoid legal consequences once they receive notice of a lawsuit, Doc. [14] ¶¶ 6–11; *see Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (explaining that ex parte orders are proper when "notice to the defendant would render fruitless the further prosecution of the action").  For example, similar individuals and entities often maintain multiple seller aliases to avoid being shut down when faced with enforcement efforts brought by Nike and similar trademark owners.  *Id.* ¶ 21.  And, should the Court eventually issue a monetary judgment, "[e]-commerce store operators like Defendants maintain offshore bank accounts and regularly move funds from their financial accounts" outside the jurisdiction of the presiding court "in an attempt to avoid payment."  *Id.* ¶ 24.  Under these circumstances, the issuance of an *ex parte* TRO is appropriate.[*]

One loose end remains, whether the Court should grant Nike's Motion for Electronic Service.  Nike argues that electronic service "is appropriate and necessary in this case," and the Court agrees.  Doc. [22] at 1.  In every matter, due process requires "notice that is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action."

---

[*] These circumstances also persuade the Court to allow Nike to file its desired documents under seal "until [it] properly serves the Defendants with notice of this pending lawsuit after funds in the Online Marketplaces have been frozen." Doc. [5] ¶ 4.  Maintaining these documents under seal at this time will help preserve the status quo and will preserve the Court's ability to grant relief in this matter.  *See IDT Corp. v. eBay*, 709 F.3d 1220, 1223 (8th Cir. 2013) (explaining that, when deciding whether to seal certain documents, the court should consider "the role the document plays in the exercise of the court's judicial power").

*Slaven v. Engstrom*, 710 F.3d 772, 779 (8th Cir. 2013).  To that end, Rule 4(f) provides that service on an individual in a foreign country can be accomplished "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention . . . or any other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f).  Because the Hague Convention does not expressly prohibit email service, *Peanuts Worldwide LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, 347 F.R.D. 316, 330 (N.D. Ill. 2024) (following "the more straightforward conclusion that the Convention does not prohibit service by email"),  the Court proceeds to consider whether Nike's proposed service method satisfies the constitutional requirement.

Here, although the Defendants' precise physical addresses are unclear, operating an e-commerce storefront on an online marketplace generally requires the verification of a functional email account.  Doc. [23] ¶ 3 (explaining that third-party marketplace platforms require those registering new e-commerce store accounts to provide a verification e-mail address "and requires the seller to click a link in the email" to confirm the email address's functionality).   Under these circumstances, email service is "reasonably calculated" to provide Defendants notice of this action. *Slaven*, 710 F.3d at 779; *see Brainlife LLC v. Beekeeper's Nats. Inc.*, 3:24-cv-01389-JPG, 2024 WL 3088538, at *6 (S.D. Ill. June 20, 2024) (finding that "email service for . . .  the defendants through the primary email they use for ecommerce is reasonably calculated to apprise them of the pendency of this action"); *accord DP Creations, LLC v. Reborn Baby Mart*, 2:21-cv-00574-JNP, 2021 WL 11585915, at *8 (D. Utah Nov. 22, 2021) ("[B]ecause Defendants are e-commerce and foreign-based companies, service of process by email is likely 'the only means of effecting service of process.'" (quoting *Rio Props, Inc. v. Rio Intern. Internlink*, 284 F.3d 1007, 1018 (9th Cir. 2002))).  Accordingly, the Court will grant Nike's Motion for Electronic Service of Process.

**III.     Conclusion**

Therefore, for all these reasons, the Court finds it appropriate to grant Nike the relief it seeks, and the Court will enter herewith a Sealed Temporary Restraining Order that grants temporary injunctive relief, authorizes electronic service, permits expedited discovery, sets a $10,000 bond subject to the results of the expedited discovery, and maintains under seal all documents currently filed under seal until further Order of the Court.

Dated this 13th day of November 2025.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE